IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | |
| STEPHEN JEMAL | : | No. 15-570 |

## MEMORANDUM

**Padova, J.**                                                                        **April 24, 2018**

On October 31, 2016, Defendant Stephen Jemal entered a plea of guilty to an Indictment that charged him with three counts of bank fraud involving three loans he obtained from Republic First Bank ("Republic").  Jemal has since filed a Motion to Withdraw his Guilty Plea. We held an evidentiary hearing on March 14, 2018, and, for the following reasons, we deny the Motion to Withdraw.

## I.        BACKGROUND

On December 3, 2015, Jemal was charged in an Indictment with three counts of bank fraud, in violation of 18 U.S.C. § 1344.   According to the Indictment, beginning in July 2005, Jemal submitted applications to Republic for a series of commercial real estate loans, loan increases, loan renewals, and loan extensions. In connection with the applications, Jemal submitted to Republic falsified brokerage account statements, which stated that he and his family owned a significant number of shares in high-value blue-chip stocks, valued anywhere between $26 million and $60 million.   In reality, the brokerage account only contained shares in a company called Nano Proprietary, Inc., and the value of those shares never exceeded $2 million. Each count of the Indictment concerns a separate loan – a $2.8 million loan issued on August 9, 2005, a $4.1 million loan issued on August 31, 2005, and a $1.85 million loan issued on December 14, 2005.   As of April of 2010, Jemal had defaulted on all three loans.

On October 31, 2016, represented by attorney Brian McMonagle, Jemal entered an open plea of guilty to all three counts of the Indictment.  (See Oct. 31, 2016 Tr. ("Plea Tr.") at 6-7.)  In response to the Court's questions at the guilty plea hearing, Jemal affirmed that no one had made "any promise to [him], of any kind, to convince or induce [him] to plead guilty."  (Id. at 7.)  He also acknowledged that he understood that he was "giv[ing] up forever, [his] right to a trial of any kind on the[] charges."  (Id. at 11.)  The Government recited at the hearing the elements of the crime of bank fraud and summarized the critical facts upon which the charges against Jemal were based.  (Id. at 12-15.)  In doing so, the Government incorporated the factual averments in the Indictment, as well as the factual averments in the Government's Change of Plea Memorandum, which Jemal acknowledged he had read and discussed with his attorney, and which he agreed accurately set forth the facts.  (Id. at 13-14.)  The Government also explicitly reiterated that Jemal had misrepresented the nature of his stock portfolio to Republic, by submitting a series of fraudulent statements that falsely showed that his portfolio held expensive stock valued between $26 million and $60 million, and further reiterated that those false statements had induced Republic to make and extend the loans at issue.  (Id. at 15.)  Jemal agreed that the Government had accurately summarized the facts.  (Id. at 16.)

The Court then advised Jemal that he faced, inter alia, a maximum aggregate prison sentence of 90 years on the three counts to which he was pleading guilty, and Jemal stated that he understood that maximum penalty.  (Id. at 16-17.)  The Court also advised Jemal that it would not know Jemal's advisory sentencing guideline range until after a presentence report was completed, and added that, even once that range was determined, the Court could impose a sentence that is more severe or less severe than the recommended guideline range.  (Id. at 18.)  Jemal stated that he understood that process.  (Id.)  Finally, the Court confirmed with Jemal that

he understood that by pleading guilty, he could not "later come back to any court and claim that [he is] not guilty" and that he would not be permitted to withdraw his plea if the court imposed a more severe sentence that he expected.  (Id. at 19.)

In August of 2017, Jemal received a copy of the presentence report.  On August 24, 2017, he wrote an email to McMonagle, in which he sought to "explain the real and whole truth as to exactly what happened and what [he] did and did not do."  (Ex. D-1 at 1.)  In that email, he asserted that "when [he] submitted a total stock value of 26M, [he] did have 26M plus in total stock value albeit not in the company names that [he] listed."  (Id. at 2.)  He further stated that his "stock portfolio had nothing to do with the[] loans [from Republic]" as the collateral for all of the loans were his real estate holdings.  (Id.)  He ultimately asserted that he did not misstate his stock holdings "to defraud the bank," had no "mal intent," and has always intended to pay Republic in full.  (Id.)  He noted, in particular, that he was pursuing a lawsuit and stated that he intended to pay restitution with his recovery from that suit.  (See id. at 2-3.)

In December 2017, Jemal retained new private counsel, Jack McMahon, and McMonagle withdrew his appearance from the case.  With McMahon's assistance, Jemal filed a Motion to Withdraw his Guilty Plea, in which he asserts that he is innocent of the crimes to which he entered a plea of guilty and that he only entered a guilty plea because McMonagle promised him that he would not be sentenced to prison time if he paid the balance of his loans prior to sentencing. (Def.'s Mot. at ¶¶ 7. 12.)

We held an evidentiary hearing on the Motion on March 14, 2018.  The parties presented testimony from Jemal, his family members, a civil lawyer who had represented Jemal in other matters, and McMonagle.  Jemal and his family members testified that they met with McMonagle in his law office immediately prior to Jemal's guilty plea hearing, and that

McMonagle told them at that meeting that if Jemal paid his restitution in full, he would not receive a prison sentence but, rather, would receive a probationary sentence.  (See Mar. 14, 2018 Tr. ("Mot. Tr.") at 8-9, 11-12, 19-20, 25, 29.)  Indeed, family members testified that McMonagle told them that "not a judge in the land . . . would sentence [Jemal] to a day in prison" if he paid his restitution in full.  (Id. at 10, 19; see also id. at 24-25.)

Jemal acknowledged on the witness stand that his testimony that McMonagle had made a promise to him regarding the sentence he would receive directly contradicted his testimony under oath at the plea hearing that no one had made any promises to him.  (Id. at 47.)  He also testified that he understood at the guilty plea hearing that the Court's question as to whether he had been made any promises to induce him to plead guilty was an important and material question.  (Id. at 53-54.)  He testified, however, that McMonagle instructed him, both prior to coming to court and while standing before the Court at the plea hearing, that he should not open his mouth or speak at the hearing, should agree with everything that the judge said, and should "not say anything other than guilty."  (Id. at 49, 55-56, 59.)  He also testified that he did not testify truthfully at the guilty plea hearing when he stated that the facts set forth in the Indictment and Change of Plea Memorandum were true, even though he appreciated at the time that his acknowledgement of the truth of those facts was material to the proceeding.  (Id. at 64-65.)

McMonagle also testified at the hearing on the Motion to Withdraw.  McMonagle testified that he told Jemal repeatedly prior to the plea hearing to assume that he was going to prison, but that he also assured Jemal that he would "fight like heck" to try to get a variance on Jemal's behalf.  (Id. at 89.)  According to McMonagle, he explained to Jemal that "the best way to try to get a variance from the guidelines . . . , which were significant, in terms of the amount of time he could spend in jail, was to try to make the victim . . . whole."  (Id. at 84.)  McMonagle

4

testified that "at no point in time did [he] ever guarantee a result, or guarantee that [the judge] would do anything," and he never "guaranteed probation." (Id. at 90-92.) He also flatly denied that he encouraged Jemal to mislead or lie to the Court at the plea hearing, or told Jemal not to talk during the hearing. (Id. at 89.)

## II.     LEGAL STANDARD

Federal Rule of Criminal Procedure 11(d)(2) provides that a defendant may withdraw his plea of guilty "after the court accepts the plea, but before [the court] imposes sentence if: . . . (B) the defendant can show a fair and just reason for requesting the withdrawal." Fed. R. Crim. P. 11(d)(2). A defendant "bears a 'substantial' burden of demonstrating a fair and just reason to withdraw a guilty plea." United States v. Morgan, 520 F. App'x 125, 127-28 (3d Cir. 2013) (quoting United States v. Jones, 336 F.3d 245, 252 (3d Cir. 2003)).

A court is to consider three factors in considering a defendant's motion to withdraw his guilty plea: "(1) whether the defendant asserts [his] innocence; (2) whether the government would be prejudiced by the withdrawal; and (3) the strength of the defendant's reason to withdraw the plea." United States v. Brown, 250 F.3d 811, 815 (3d Cir. 2001) (citation omitted). "The district court retains a great deal of discretion to deny a withdrawal motion." United States v. Jones, 979 F.2d 317, 318 (3d Cir. 1992). Moreover, "[a] shift in defense tactics, a change of mind, or the fear of punishment are not adequate reasons to impose on the government the expense, difficulty, and risk of trying a defendant who has already acknowledged his guilt by pleading guilty." Brown, 250 F.3d at 815 (quoting Jones, 979 F.2d at 318).

## III.    DISCUSSION

In his Motion, Jemal argues that we should permit him to withdraw his plea, because he is actually innocent of the crime, he has strong reasons to withdraw his plea, and there is no

prejudice to the Government.  The Government argues that Jemal has failed to establish all three of these factors and, thus, we should deny the Motion to Withdraw.

    A.   <u>Actual Innocence</u>

As noted above, the first factor a court must consider in assessing a Motion to Withdraw is whether the defendant asserts his innocence.  <u>Brown</u>, 250 F.3d at 815.  "Bald assertions of innocence[, however,] are insufficient to permit a defendant to withdraw his guilty plea."  <u>Jones</u>, 336 F.3d at 252.  Rather, a defendant's "[a]ssertions of innocence must be buttressed by facts in the record that support a claimed defense."  <u>Id.</u> (quoting <u>Brown</u>, 250 F.3d at 818).  Jemal argues in this case that he is innocent of bank fraud because he did not intend to steal from Republic but, instead, always intended, and still intends, to pay back the money he borrowed.

The federal bank fraud statute makes it a crime to:

knowingly execute[], or attempt[] to execute, a scheme or artifice –

> (1) to defraud a financial institution; or
>
> (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises.

18 U.S.C. § 1344.  The Supreme Court has held that the two clauses of § 1344 are to be read disjunctively (as the "or" between them indicates) and, thus, the two clauses establish distinct offenses, albeit offenses with overlap considerably.  <u>Loughrin v. United States</u>, 134 S. Ct. 2384, 2390 n.4 (2014).[1]  Here, the Government charged Jemal under both subsections of the statute

---

[1] The United States Court of Appeals for the Third Circuit previously endorsed a conjunctive reading of the two sections of § 1344, stating that "a 'disjunctive reading . . . . of § 1344 . . . gives the statute a breadth of scope that extends well beyond what Congress intended the statute to regulate.'"  <u>United Stated v. Leahy</u>, 445 F.3d 634, 642 (3d Cir. 2006) (quoting <u>United States v. Thomas</u>, 315 F.3d 190, 196 (3d Cir. 2002)) (second alteration in original). However, that interpretation of § 1344 did not survive <u>Loughrin</u>.

because it charged in each count of the Indictment that Jemal "knowingly executed, and attempted to execute, a scheme to defraud Republic *and* to obtain monies owned by and under the care, custody and control of that bank by means of false and fraudulent pretenses, representations, and promises."  (E.g., Indictment at 7 (emphasis added).)  Where the Indictment "charge[s] both aspects of [an] offense," the defendant can be convicted "if the government prove[s] he was guilty under either."  United States v. Schwartz, 899 F.2d 243, 246 (3d Cir. 1990) (citing United States v. Frankel, 721 F.2d 917, 920 (3d Cir. 1983)).

There can be no question in this case that Jemal "knowingly execute[d]  . . . a scheme  . . . (2) to obtain . . . the moneys . . . under the custody or control of [Republic], by means of false or fraudulent . . . representations . . . ."  18 U.S.C. § 1344.  Indeed, he readily admits that he provided Republic false information in his loan applications insofar as he misrepresented the companies in which he held stock.  (See Ex. D-1 at 2.)  There is also no question that Jemal "knowingly execute[d] a . . . scheme . . . (1) to defraud a financial institution," id. § 1344, because a "scheme to defraud a financial institution" includes a scheme to deceive a bank in order to bring about gain or benefit to oneself.  See United Stated v. Leahy, 445 F.3d 634, 644 (3d Cir. 2006).  As Jemal admittedly misrepresented his stock holdings on his loan application, the facts he concedes make clear that he knowingly deceived the bank in order to bring about a benefit to himself.

While Jemal contends that he is innocent of the offenses charged because he always intended to repay the loans, a defendant can be found guilty under the bank fraud statute whether or not he ultimately intended to cause the bank a financial loss.  See Shaw v. United States, 137 S. Ct. 462, 467 (2016) (stating that the statute "demands neither a showing of ultimate financial loss nor a showing of intent to cause financial loss"); id. at 469 ("[T]he Government need not

prove that the defendant intended that the bank ultimately suffer monetary loss."); Loughrin, 134 S. Ct. at 2395 n.9 (rejecting argument that § 1344(2) requires the Government to prove that the defendant's scheme created a risk of financial loss to the bank); see also United States v. Khorozian, 333 F.3d 498, 505 (3d Cir. 2003) (citing with approval United States v. Moran, 312 F.3d 480 (1st Cir. 2002), as holding that defendants who made misrepresentations in connection with loan applications were "guilty even though they did not specifically intend to cause the bank a loss (*i.e.*, they intended that the loans would be repaid), but rather intended only to make *misrpresentations* that made a loss more likely"). Accordingly, we conclude that Jemal has done nothing more than "baldly" assert his innocence, as he has not set forth any facts that would support a valid defense to bank fraud. Thus, this first factor that we must consider does not weigh in favor of permitting Jemal to withdraw his guilty plea.

   B.   Strength of Defendant's Reason to Withdraw His Plea

The second factor a court must consider in assessing a Motion to Withdraw is the strength of the defendant's reason to withdraw. Brown, 250 F.3d at 815. Jemal argues that he should be permitted to withdraw his plea because his plea was not knowing and intelligent. Specifically, he argues that the only reason that he pled guilty was because McMonagle promised him that if he paid the entire balance of his loan to Republic before sentencing, he would not be sentenced to prison time.

We find incredible Jemal's testimony that McMonagle promised him that he would not be sentenced to prison if he paid his restitution in full. As an initial matter, that testimony is directly contradicted by Jemal's sworn testimony at the Change of Plea Hearing that no promises had been made to him to induce or convince him to plead guilty. (See Plea Tr. at 7.) While Jemal now asserts that his testimony at the Change of Plea Hearing was untruthful, his current

testimony that he lied to the Court at the Change of Plea Hearing does nothing to convince us that he is being truthful in his sworn testimony now.  We are also not persuaded by the testimony of Jemal's family members and civil lawyer that McMonagle said that Jemal would not serve jail time if he paid his restitution in full.  Rather, we fully credit the testimony of Brian McMonagle, a well-respected local criminal defense attorney, who has practiced criminal defense in both state and federal courts since 1991.  (Mot. Tr. at 80-81.)  McMonagle credibly testified that he advised Jemal about the <u>possibility</u> of a downward variance from the sentencing guideline range, and that he told Jemal that he would have the strongest argument for a variance if Jemal was able to make full restitution prior to sentencing.  (<u>Id.</u> at 84-85, 87-89.)  He also testified that he at no time guaranteed Jemal that if he paid restitution, he would get a probationary sentence and that he repeatedly told Jemal that he should assume that he was going to prison.  (<u>Id.</u> at 87, 89.)

Based on these credibility determinations, and Jemal's sworn testimony at the plea hearing that he had been made no promises to induce him to plead guilty and that he understood that he faced 90 years in prison, we reject Jemal's claim that his guilty plea was not knowing and intelligent because he relied on a false promise that he would not receive a jail sentence.  We therefore conclude that he has failed to establish a valid reason to withdraw his plea, and this factor, like the first, does not weigh in favor of permitting Jemal to withdraw his guilty plea.

C.    <u>Prejudice to the Government</u>

The final consideration in assessing a defendant's Motion to Withdraw is whether the Government would be prejudiced by the withdrawal.   <u>Brown</u>, 250 F.3d at 815.  However, where a defendant has not established the first two factors of the withdrawal analysis, the Government is not required to show that it would be prejudiced by the withdrawal.  <u>Jones</u>, 336 F.3d at 255.  Accordingly, based on our conclusions with regard to the first two factors, the Government need

not demonstrate prejudice here.  Nevertheless, we conclude that permitting Jemal to withdraw his guilty plea would undoubtedly cause the Government prejudice because it would subject the Government to "the expense, difficulty, and risk of trying a defendant who has already acknowledged his guilty by pleading guilty."  Brown, 250 F.3d at 815.  Consequently, this third factor also does not weigh in favor of permitting Jemal to withdraw his plea.

## IV.   CONCLUSION

For the foregoing reasons, we conclude that Jemal has not demonstrated a fair and just reason for withdrawal of his plea as none of the three factors we are to consider in connection with a Motion to Withdraw weighs in favor of permitting withdrawal.  We therefore deny Jemal's Motion to Withdraw his Guilty Plea.  An appropriate Order follows.

BY THE COURT:

/s/ John R. Padova, J.

_____

John R. Padova, J.